# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES A. SCOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:13CV63 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying the application of James A. Scott for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. *See* 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. [Doc. 20] Defendant filed a Brief in Support of the Answer. [Doc. 25]

## Procedural History

On August 11, 2009, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income, claiming that he became unable to work due to his disabling condition on June 6, 2006.[1] (Tr. 182-83, 189-92) Plaintiff's claims were denied initially and, following an administrative hearing, plaintiff's claims were denied in a written opinion by an Administrative Law Judge (ALJ), dated May 7, 2012. (Tr. 95-99, 10-23) Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security

---

[1] During the hearing, Plaintiff amended his onset of disability date to October 24, 2008. (Tr. 32).

Administration (SSA), which was denied on February 19, 2013. (Tr. 1-5) Thus, the decision of the ALJ stands as the final decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.      First ALJ Hearing

Plaintiff's initial administrative hearing was held on June 7, 2011. (Tr. 31) Plaintiff was present and was represented by counsel. Plaintiff's attorney stated that Plaintiff was amending his alleged onset date to October 24, 2008. (Tr. 32)

The ALJ indicated that because the vocational expert was unable to attend the hearing, a supplemental hearing would be held. (Tr. 33)

The ALJ examined Plaintiff, who testified that he was 39 years of age, and lived with his fourteen-year-old son. Plaintiff stated that he lived approximately 120 miles away from the hearing location, and that his father drove him to the hearing. Plaintiff testified that he only drives "a little," because driving hurts his back. (Tr. 34)

Plaintiff stated that he completed the twelfth grade. (Tr. 34) Plaintiff testified that he took vocational classes the last two years of high school, in which he learned how to build houses. Plaintiff stated that he was in the special education program, because he was a "slow learner." (Tr. 35)

Plaintiff testified that he last worked at Wallace and Owens, a grocery store, as a meat cutter. Plaintiff stated that he started working as a cleaner, and worked his way up to a meat cutter. Plaintiff testified that he worked as a meat cutter for three years at Town and Country, and then left to work at Wallace and Owens for more money. Plaintiff stated that he worked at Wallace and Owens for eleven months, until he was laid off. (Tr. 35-36)

Prior to working as a meat cutter, Plaintiff worked for the City of Kennett as a highway worker for five years, he also worked for Wiese Company unloading trucks for approximately eleven months, (Tr. 37), and Wal-Mart doing janitorial work (Tr. 38).

Plaintiff testified that he originally alleged an onset of disability date of June 6, 2006, because he was laid off on that date. Plaintiff stated that his employer did not give him a reason for laying him off. (Tr. 38)

Plaintiff testified that he is unable to work because his back hurts, and his doctor told him he should not bend or sit for long periods of time. Plaintiff stated that he tried to return to a meat cutting position on two or three occasions and was unable to perform the position due to pain. Plaintiff testified that he also applied for a position in the lawn and garden department at Wal-Mart, but he did not get the position. (Tr. 38)

Plaintiff stated that he experiences pain in his upper back, and numbness in his legs and arms. Plaintiff testified that he has a pinched nerve that causes numbness. Plaintiff stated that he has been receiving treatment for these conditions from Dr. Mona Tomescu since 2008. Plaintiff testified that Dr. Tomescu has ordered MRIs and has referred him to other doctors for injections. Plaintiff stated that he has seen surgeons, who told him that surgery would not help. (Tr. 38-39)

Plaintiff testified that he takes Hydrocodone[2] and Tramadol[3] for pain; Mirapex[4] for restless leg syndrome;[5] over-the-counter medication for acid reflux; Skelaxin,[6] a muscle relaxer;

---

[2] Hydrocodone is an opioid analgesic indicated for the relief of moderate to moderately severe pain. See Physician's Desk Reference (PDR), 3144-45 (63rd Ed. 2009).

[3] Tramadol is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

[4] Mirapex is indicated for the treatment of restless legs syndrome. See PDR at 858.

[5] A sense of indescribable uneasiness, twitching, or restlessness that occurs in the legs after going to bed, frequently leading to insomnia, which may be relieved temporarily by walking about;

an inhaler for COPD;[7] and medication for high cholesterol.   (Tr. 40-41)   Plaintiff testified that he has been using a cane for balance since 2008.   Plaintiff explained that he requested a prescription for a cane after falling in a parking lot.   (Tr. 41)

Plaintiff testified that, on a bad day, he does not do anything.   Plaintiff stated that he is unable to do housework or yard work.   Plaintiff testified that he just sits at his house, takes medication, and goes back to bed.   (Tr. 41-42)

Plaintiff stated that the maximum amount of weight he is able to lift without experiencing too much pain is five to ten pounds.   Plaintiff testified that he is unable to lift a gallon of milk. Plaintiff stated that his son helps him with his personal needs such as dressing, feeding, and bathing.   Plaintiff explained that his son watches him to make sure he does not fall when bathing, and helps him put on his socks and shoes.   (Tr. 43)

Plaintiff testified that his friends come to his home and cook for him.   Plaintiff stated that his son does his laundry.   Plaintiff testified that his friends take him to do his shopping.   (Tr. 44)

Plaintiff testified that he has tried physical therapy, but was unable to perform the prescribed exercises.   (Tr. 44)

Plaintiff stated that his parents and his girlfriend support him financially.   Plaintiff testified that he receives Medicaid benefits, and Temporary Assistance for Needy Families ("TANF") benefits.   (Tr. 44-45)

Plaintiff testified that he has not been referred to a pain clinic.   (Tr. 46)

---

thought to be caused by inadequate circulation or as a side effect of some SSRIs and other psychotropic medications.   Stedman's Medical Dictionary, 1911 (28th Ed. 2006).
[6] Skelaxin is indicated for treatment of acute, painful musculoskeletal conditions.   See PDR at 1784.
[7] Chronic obstructive pulmonary disease ("COPD") is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied.   Stedman's at 554.

Plaintiff stated that he listens to music, watches television, and reads the newspaper to pass the time.   Plaintiff testified that he goes to his parents' house to visit for one to two hours at a time. (Tr. 47)

Plaintiff stated that he experiences pain in his lower back, and between his shoulders. Plaintiff testified that his back pain decreases when he is lying down.   (Tr. 48)

Plaintiff's attorney examined Plaintiff, who testified that he experiences muscle spasms in his lower back and legs.   Plaintiff stated that the muscle spasms occur approximately four days a week, rain and cold weather cause his upper and lower back pain to increase, and he is unable to bend to the floor due to lower back pain.   He further testified that he would be unable to work with his arms out in front of him or over his head for long periods of time because these positions cause him to experience pain.   (Tr. 49)

Plaintiff stated that he is able to stand in one place for about five minutes before he experiences lower back pain.   Plaintiff testified that he is able to walk "seven or eight steps" before his legs and lower back start hurting.   Plaintiff stated that he experiences difficulty getting in and out of chairs due to his poor balance.   Plaintiff testified that he is able to sit for five to ten minutes before he experiences back and leg pain.   (Tr. 50)

Plaintiff stated that his ability to concentrate has worsened since October of 2008, and that he has to take frequent notes in order to remember things.   (Tr. 50)

Plaintiff testified that he typically wakes up three to four times during the night due to back and leg pain.   Plaintiff stated that he naps during the afternoon between 12:00 p.m. and 2:00 p.m. and again between 4:00 p.m. and 8:00 p.m. about three times a week.   He explained that he is no longer able to mow the yard, hunt, or fish due to his back and leg pain; in any given week he experiences good days, but about four to five bad days; and on bad days, he just sits around due to

severe back pain.   Plaintiff testified that he would work if he were able to work.   (Tr. 51)

The ALJ next re-examined Plaintiff, who testified that he no longer takes medication for depression, because his depression improves when his friends visit.   Plaintiff stated that he had experienced a period of depression when his son went to school and was unable to work.   (Tr. 52)

Plaintiff's attorney made a closing statement, in which he argued that Plaintiff's condition met Listing 1.04 due to Plaintiff's multiple back problems.   (Tr. 53)   Plaintiff's attorney argued in the alternative that Plaintiff was unable to maintain concentration, persistence and pace necessary to engage in competitive work activity due to his back problems.   (Tr. 54)

The ALJ indicated that he would either make a final decision, order a consultative examination, or hold a supplemental hearing.   Id.

**B.** **Supplemental ALJ Hearing**

A supplemental hearing was held on April 17, 2012, at which Plaintiff and Plaintiff's attorney appeared.   Also present via telephone were John Grenfell, vocational expert; and Dr. Janese, medical expert.   (Tr. 58)

Plaintiff's attorney examined Plaintiff, who testified that he was still using his cane regularly; he holds his cane in his right, dominant, hand, he uses his cane to help with balance, and he was not working at the time of the hearing.   (Tr. 61)

Plaintiff stated that he took special education classes all twelve years of school and had Medicaid coverage for the past five or six years.   (Tr. 62)

The ALJ examined medical expert Dr. Janese, who testified that he had reviewed Plaintiff's medical records.   (Tr. 63)   Dr. Janese summarized Plaintiff's medical records.   He noted that Plaintiff had the following diagnoses:   chronic obstructive airway disease ("COAD") or chronic obstructive pulmonary disease ("COPD"), sleep apnea, ulcers, degenerative disc

disease, increased cholesterol, and a full scale IQ score of 70.   (Tr. 64-67)   Dr. Janese expressed the opinion that Plaintiff has the residual functional capacity to perform medium work, which is defined as lifting 50 pounds occasionally and 25 pounds frequently; and sitting and standing for six hours.   (Tr. 67)

Dr. Janese testified that COAD and COPD are different terms for the same impairment, and both "generally mean[] emphysema and chronic bronchitis."   Dr. Janese testified that, if Plaintiff were to stop smoking, his lungs would start to improve in about a decade.   Dr. Janese stated that, if Plaintiff keeps smoking, he will be "in respiratory trouble or oxygen exchange" at the age of 55 to 60.   (Tr. 68)

Plaintiff's attorney examined Dr. Janese, who testified that he was familiar with Listing 12.05.   Dr. Janese testified that Plaintiff obtained a verbal IQ score of 66, a performance IQ of 80, and a full scale IQ of 70; and earned "C"s and "D"s in school.   Dr. Janese testified that Plaintiff must have "at least low average intelligence" based on his grades.   (Tr. 69)

The ALJ next examined vocational expert Dr. Grenfell.   Dr. Grenfell stated that Plaintiff did not describe his past work as a painter and assembler.   Plaintiff testified that he assembled picture frames at this position, and lifted up to 20 pounds.   (Tr. 72)

Dr. Grenfell described Plaintiff's past work as follows: municipal maintenance worker (heavy, semi-skilled); meat cutter (medium, semi-skilled); and painter/assembly (light, unskilled). (Tr. 73)

The ALJ asked Dr. Grenfell to assume a hypothetical individual with Plaintiff's background and the following limitations: lift 20 pounds occasionally and 10 pounds frequently; stand and walk six hours out of an eight-hour workday; sit six hours out of an eight-hour workday; avoid ambulation on unimproved terrain like open fields, and plowed fields; avoid climbing

ladders, ropes and scaffolds; occasionally kneel, stoop , crouch, and crawl; limited to simple and/or repetitive work; and should avoid close interaction with the public.   (Tr. 73-74)   Dr. Grenfell testified that the individual would be able to perform Plaintiff's past position as a painter/assembler.   (Tr. 74)

The ALJ next asked Dr. Grenfell whether the individual could perform any work if he were limited to sedentary work.   (Tr. 75)   Dr. Grenfell testified that the individual could perform the following unskilled, sedentary positions:   surveillance system monitor (200,000 positions nationally, 10,000 in Missouri); order clerk (80,000 positions nationally, 600 in Missouri); and addresser (40,000 positions nationally, 400 in Missouri).   (Tr. 75-76)

The ALJ asked Dr. Grenfell whether the individual would be able to perform the sedentary jobs he identified if he were late to work or had to leave early at least once a week.   (Tr. 76)   Dr. Grenfell testified that such a limitation would preclude competitive employment.   (Tr. 77)

Plaintiff's attorney next asked Dr. Grenfell whether the hypothetical claimant would be able to maintain employment if his productivity was 25 percent less than standard due to an inability to use one of his arms while holding a cane.   Dr. Grenfell testified that such an individual would be unable to maintain employment.   (Tr. 77)

Plaintiff's attorney made a closing statement, in which he argued that Plaintiff's condition meets a listed impairment based on his IQ and his medical issues.   (Tr. 78)

## C.   **Relevant Medical Records**

Plaintiff presented to Steele Family Clinic on January 18, 2007, with complaints of lower back pain and restless legs.   (Tr. 339)

Plaintiff presented to the Malden Medical Center on February 13, 2007, with complaints of left leg numbness.   (Tr. 263)   The examining physician ordered an MRI of the lumbar spine.

Plaintiff underwent an MRI of the lumbar spine on February 13, 2007, which revealed degenerative disc disease of the L5-S1 level with posterior disc bulging along with moderate sized left paracentral disc herniation producing impingement of the left S1 nerve root.   (Tr. 262)

Plaintiff underwent an MRI of the cervical spine on April 18, 2007, which revealed bulging discs at the C6-7 and C7-T1 levels, degenerative disc disease of all the cervical discs, and narrowing of the neuroforamen on the left at the C5-6 level and bilaterally at the C6-7 and C7-T1 levels.   (Tr. 261)

Plaintiff presented to Steele Family Clinic regularly from August 2007, through December 2008 with complaints of back pain and intermittent muscle spasms/restless leg syndrome.   (Tr. 304-37)   Decreased range of motion of the lumbar spine was noted in January 2008, April 2008, and June 2008.   (Tr. 325, 317, 313)   Plaintiff was diagnosed with degenerative disc disease, chronic back pain, and restless leg syndrome.   He was prescribed medication, including Robaxin,[8] Ultram,[9] Skelaxin, and Tramadol.   Id.

Mona Tomescu, M.D., a physician at Steele Family Clinic, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on April 28, 2008.   (Tr. 425-27) Dr. Tomescu expressed the opinion that Plaintiff could only occasionally lift less than ten pounds and could not frequently lift any amount of weight; and could stand or walk less than 2 hours in an 8 hour workday.   Dr. Tomescu indicated that her conclusion was based on physical examinations and an MRI of the cervical spine.   (Tr. 425)   Dr. Tomescu found that Plaintiff could sit less than 6 hours of an 8 hour workday, requires unscheduled breaks during an 8 hour working day, and

---

[8] Robaxin is a muscle relaxer indicated for the treatment of muscle spasms.   See WebMD, http://www.webmd.com/drugs (last visited August 22, 2014).
[9] Ultram is a centrally acting analgesic indicated for the management of moderate to moderately severe pain.   See PDR at 2553.

needs a job that permits shifting positions at will from sitting, standing, or walking.   In addition, Dr. Tomescu found that Plaintiff could never climb, stoop, kneel, crouch, or crawl; could occasionally balance; and was limited in his ability to reach, handle, finger, feel, see, hear, and speak.   As support for this finding, Dr. Tomescu stated that Plaintiff has severe degenerative disc disease of the cervical spine, with multiple bulging discs and "with severe motor and sensory impairment."   (Tr. 427)   Dr. Tomescu also found that Plaintiff should avoid heights, moving machinery, and temperature extremes.   Dr. Tomescu indicated that her assessment covered the period of January 10, 2007 through April 28, 2008, and that she last saw Plaintiff on April 28, 2008.   Dr. Tomescu indicated that Plaintiff's diagnosis was multiple cervical herniated discs and degenerative cervical spine disease.   (Tr. 426)

Dr. Tomescu also completed a "Medical Opinion to Medical Listing 1.04," in which she expressed the opinion that Plaintiff's condition meets Listing 1.04A and 1.04C due to spinal stenosis[10] at the cervical level.   (Tr. 423)

Plaintiff presented to Steele Family Clinic on October 9, 2008, at which time he reported his pain had improved.   (Tr. 307)   On December 4, 2008, Plaintiff complained of severe back pain.   Plaintiff was prescribed Skelaxin and Tramadol.   (Tr. 303)

Plaintiff saw Paul W. Rexroat, Ph.D. on January 9, 2009, for a psychological examination at the request of the state agency.   (Tr. 265-69)   Dr. Rexroat administered the Wechsler Adult Intelligence Scale-III ("WAIS-III"), which revealed a Verbal Scale IQ of 66, Performance Scale IQ of 80, and Full Scale IQ of 70.   (Tr. 266)   Upon mental status examination, Plaintiff did not describe significant symptoms of major psychopathology.   (Tr. 268)   Dr. Rexroat found that Plaintiff is able to understand and remember simple instructions; sustain concentration and

---

[10] Narrowing of the spinal canal.   See Stedman's at 1832.

persistence with simple tasks; interact socially; and has moderate limitations in his ability to adapt to his environment.  Id.  Dr. Rexroat diagnosed Plaintiff with borderline intelligence,[11] with a GAF score of 60.[12]  (Tr. 269)

On January 11, 2009, Plaintiff was prescribed a four-prong cane by a physician at Steele Family Clinic.  (Tr. 428)

Plaintiff received treatment at Steele Family Clinic approximately monthly from January 2009 through September 2009.  On February 19, 2009, Plaintiff was diagnosed with COPD, lower back pain, and restless leg syndrome.  (Tr. 300)  On March 19, 2009, Plaintiff was diagnosed with chronic fatigue syndrome, muscle aches, and restless leg syndrome.  (Tr. 298)  On May 12, 2009, Plaintiff complained of numbness in his feet.  (Tr. 293)  Plaintiff was diagnosed with lower extremity pain and numbness.  (Tr. 294)  On June 15, 2009, Plaintiff complained of persistent back pain.  (Tr. 290)  Plaintiff was diagnosed with chronic upper and lower back pain.  (Tr. 291)

Plaintiff underwent an MRI of the cervical spine on July 2, 2009, which revealed spurring at C6-7 with a broad-based disc bulge.  (Tr. 271)  An MRI of the lumbar spine revealed disc herniation to the left at L5-S1 and anterior spondylolisthesis[13] of L5 on S1.  (Tr. 272)

Plaintiff presented to Steele Family Clinic on September 9, 2009, at which time he continued to complain of severe lower back pain.  (Tr. 286)

Plaintiff presented to neurosurgeon Sonjay Fonn, D.O., on December 2, 2009, with

---

[11]  Borderline intellectual functioning is defined as an IQ in the 71-84 range.  See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 684 (4th Ed. 1994).

[12]  A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[13]  Forward movement of the body of one of the lower lumbar vertebrae on the vertebrae below it or on the sacrum.  See Stedman's at 1813.

complaints of neck and back pain.   Plaintiff reported that his neck pain radiates to his wrist, worse on the right than the left; and he has paresthesia, but no weakness.   Plaintiff reported that his back pain radiates down to his right leg and is worse in the left leg.   (Tr. 368)   Upon examination, Plaintiff had full motor strength throughout, normal gait and station, and normal tone, with no atrophy.   Plaintiff's sensation was intact throughout.   Dr. Fonn stated that an MRI of the cervical spine shows a disc bulge at the C6-C7 level with mild spinal cord compression; and an MRI of the lumbar spine shows a disc herniation at the L5-S1 level.   Dr. Fonn's assessment was degenerative disc disease of the C6-C7 level and the L5-S1 level.   Dr. Fonn recommended that Plaintiff undergo a course of physical therapy.   Dr. Fonn indicated that Plaintiff would return to his office after physical therapy, and may be a candidate for epidural injections of the C6-C7 levels.   (Tr. 369)

Plaintiff saw Dr. Fonn for follow-up on February 3, 2010, at which time he reported he had attended physical therapy and found it "only minimally helpful."   Dr. Fonn indicated that he had reviewed Plaintiff's MRI again and it revealed "mild pathology" at the C6-7 level.   Dr. Fonn stated that he discussed with Plaintiff that it was "mild enough" that it would not warrant any surgical intervention.   Dr. Fonn recommended "conservative treatment" such as injections. Plaintiff indicated that he wished to proceed with injections, and a course of epidural injections at the C6-7 level was scheduled.   (Tr. 388)

Plaintiff returned for follow-up on March 3, 2010, at which time he reported that the epidural injections had given him "significant relief" of his symptomatology greater than 50 percent and he wished to put off surgery.   Dr. Fonn recommended repeating the epidural injections every six months and Plaintiff was agreeable.   He stated that surgical intervention would be considered if Plaintiff's symptomatology "gets significantly worse" in less than six

months.   (Tr. 389)

Plaintiff presented to Dr. Tomescu on March 31, 2011, for medication refills, at which time he reported he had been out of pain medication for a month.   (Tr. 412)   Plaintiff complained of chronic lower back pain.   Plaintiff reported no weakness or loss of sensation.   (Tr. 413)   Upon examination, Dr. Tomescu noted tenderness to palpation to L4-5 region, decreased flexion and extension, and positive straight leg test bilaterally.   Plaintiff's extremities were normal.   Dr. Tomescu diagnosed Plaintiff with chronic low back pain and refilled his medications.   (Tr. 414) On May 16, 2011, Dr. Tomescu noted no abnormalities on examination.   Dr. Tomescu indicated that Plaintiff had full range of motion of the neck, normal gait without use of assistive devices, intact range of motion of the spine, normal flexibility of joints, no tenderness to palpation, normal extremities, and normal sensation.   Dr. Tomescu diagnosed Plaintiff with back pain and muscle spasms, and prescribed Ultram and Skelaxin.   (Tr. 417)

Plaintiff saw Barry Burchett, M.D., for an internal medicine examination upon the referral of the state agency on November 1, 2011.   (Tr. 431-36)   Plaintiff complained of lower and upper back pain.   Plaintiff reported that he had been using a cane constantly for the past five to six years because of back pain.   Plaintiff did not report any giving way of the lower extremities.   (Tr. 431) Plaintiff ambulated into the examination room with the cane in his right hand; and the subsequent exam was without the cane.   Plaintiff ambulated with a slow, exaggerated gait, with which he took very short steps.   Plaintiff appeared stable at station and comfortable in the supine and sitting positions.   Plaintiff's mood seemed flat; and his recent and remote memory for medical events was good.   (Tr. 433)   Examination of the cervical spine revealed no tenderness over the spinous process, and no evidence of paravertebral muscle spasm.   Examination of the dorsolumbar spine revealed normal curvature, no evidence of paravertebral muscle spasm, and no tenderness to

percussion of the dorsolumbar spinous processes.   Straight leg raise test was positive bilaterally in the supine position, at 25 degrees on the right and 75 degrees on the left.   Plaintiff was able to stand on one leg at a time without difficulty.   Plaintiff's neurological examination revealed no evidence of atrophy, and well-preserved sensory modalities.   Plaintiff reported decreased light touch sensation over the entire right thigh area.   Plaintiff was able to walk on his heels and toes, but placed his hand on the table to help him maintain balance.   Plaintiff "did not perform tandem gait very well, somewhat in an exaggerated fashion."   Plaintiff only squatted to 50 degrees of knee flexion because of complaints of low back pain.   Plaintiff was able to walk 50 feet without assistance.   Dr. Burchett diagnosed Plaintiff with chronic low back pain and chronic upper back pain.   Dr. Burchett noted in summary that Plaintiff's straight leg raising test was positive bilaterally in the supine position, markedly on the right, and that the range of motion of the hips could not be determined because of this.   Dr. Burchett noted that Plaintiff has full range of motion of the cervical spine, and that there was no evidence of compressive neuropathy in the upper extremities.   Finally, Dr. Burchett stated that Plaintiff "apparently uses a cane constantly, although this may not be medically necessary."   (Tr. 434)

## D.   <u>School Records</u>

Plaintiff's school records from Kennett Public Schools reveal that Plaintiff's grades varied. In middle school, Plaintiff earned mostly "C"s and "D"s.   (Tr. 259)   In high school, Plaintiff took mostly Educable Mentally Handicapped ("EMH") classes, and earned grades varying from an "A-" (in twelfth grade Math), to "F" (in ninth grade Health and twelfth grade PE).   (Tr. 255)

Plaintiff underwent Missouri Mastery and Achievement Tests in tenth grade, which revealed scores in the first percentile in English/Language Arts and Mathematics; nineteenth percentile in Science; and eleventh percentile in Social Studies/Civics.   (Tr. 256)   Plaintiff also

underwent School and College Ability Tests in the eleventh grade, which revealed Verbal and

Quantitative scores in the first percentile.

## **The ALJ's Determination**

The ALJ made the following findings:

1.   The claimant met the insured status requirements of the Social Security Act
     through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since October 24,
     2008, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et
     seq*.).

3.   The claimant has the following severe impairments: degenerative disc disease of
     the lumbar and cervical spine, and borderline intellectual functioning (20 CFR
     404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that
     meets or medically equals the severity of one of the listed impairments in 20 CFR
     Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
     416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the
     claimant has the residual functional capacity to perform light work as defined in 20
     CFR 404.1567(b) and 416.967(b) except he must avoid walking on uneven terrain
     or climbing ladders, ropes or scaffolds, but he can occasionally stoop, kneel,
     crouch, and crawl.   Additionally, the claimant is limited to performing simple,
     repetitive tasks with no close public interaction.

6.   The claimant is capable of performing past relevant work as a painter and
     assembler.   This work does not require the performance of work related activities
     precluded by the claimant's residual functional capacity (20 CFR 404.1565 and
     416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act,
     from October 24, 2008, through the date of this decision (20 CFR 404.1520(f) and
     416.920(f)).

(Tr. 15-23)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on August 11, 2009, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on August 11, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 23)

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.    See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).    The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.    See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).    Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.    See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).    If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.    See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).    The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.    See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).    "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."    Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).    The analysis required has been described as a "searching inquiry."    Id.

**B.**      <u>Determination of Disability</u>

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. <u>See</u> <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920(b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. <u>See</u> 20 C.F.R §§ 404.1520(c), 416.920(c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." <u>Id.</u> Age, education and work experience of a claimant are not considered in making the "severity" determination. <u>See</u> <u>id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). The listed impairments are found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be

impaired.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   See 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).   The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:   activities of daily living, social functioning, concentration, and persistence or pace.   See

20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3).   Functional loss is rated on a scale that ranges

from no limitation to a level of severity, which is incompatible with the ability to perform

work-related activities.   See id.   Next, the Commissioner must determine the severity of the

impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a(c), 416.920a(c).   If the

impairment is severe, the Commissioner must determine if it meets or equals a listed mental

disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing

the presence of medical findings and the rating of functional loss against the paragraph A and B

criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe

impairment, but the impairment does not meet or equal the listings, then the Commissioner must

prepare a residual functional capacity assessment.   See 20 C.F.R. §§ 404.1520a(c)(3), 416.920a

(c)(3).

**C.      Plaintiff's Claims**

        Plaintiff first argues that the ALJ erred in not finding that Plaintiff meets the requirements

of Listing 12.05C.   Plaintiff next argues that the ALJ erred in determining Plaintiff's RFC.   The

undersigned will discuss plaintiff's claims in turn.

**1.      Listing 12.05C**

        "The claimant has the burden of proving that his impairment meets or equals a listing,"

Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010); and, "'[t]o meet a listing, an impairment

must meet all of the listing's specified criteria,'" id. (quoting Johnson v. Barnhart, 390 F.3d 1067,

1070 (8th Cir. 2004)).

        Listing 12.05 provides as follows:

        12.05   Mental Retardation: Mental retardation refers to significantly subaverage
                general intellectual functioning with deficits in adaptive functioning initially

manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

                    ***

          C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05.

In addition, the overall introduction to the mental disorders section states:

Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.   It also contains four sets of criteria (paragraphs A through D).   If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

Id. at § 12.00.

The Eighth Circuit has held that the requirements in the introductory paragraph of Listing 12.05-the diagnostic description of mental retardation-are mandatory.   Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).   Thus, in order to qualify as mentally retarded under Listing 12.05C, Plaintiff was required to show: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning, (2) an onset of that impairment prior to age twenty-two, (3) a valid IQ score between 60 and 70, and (4) an additional impairment imposing a significant work-related limitation of function.   See Cheatum v. Astrue, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (holding that a claimant must prove deficits in adaptive functioning in addition to the elements of paragraph C); Maresh, 438 F.3d at 899.

In this case, the ALJ considered Listing 12.05C, but found that Plaintiff's mental impairment did not meet the Listing's requirements, because he did not demonstrate the required

deficits in adaptive functioning.   (Tr. 16)   The ALJ's determination is supported by substantial evidence.

The ALJ first acknowledged that plaintiff's IQ scores placed him within the range of Listing 12.05C.   Specifically, the ALJ noted that Plaintiff achieved a Full Scale IQ score of 70 when tested in 2009 at the age of 37 by Dr. Rexroat.   (Tr. 16, 266)   The ALJ stated that the intelligence test administered by Dr. Rexroat is but one factor in evaluating the listing's requirements.

The ALJ next discussed Plaintiff's education.   He noted that Plaintiff is a high-school graduate, notwithstanding his receipt of special education services.   (Tr. 17)   The ALJ pointed out that Plaintiff obtained mostly "C"s and "D"s, although he failed health and physical education, and obtained "A"s in Math.   (Tr. 16, 255)

The ALJ noted that Plaintiff reported that he performs adaptive activities such as paying bills, shopping, and preparing simple meals.   (Tr. 17, 222-30)

The ALJ next pointed out that Plaintiff performed work at substantial gainful activity levels prior to his alleged onset date.   (Tr. 17)    Specifically, Plaintiff performed skilled work as a meat cutter, which generally has a specific vocational preparation (SVP) level of 6,[14] according to the testimony of the vocational expert.   As the ALJ noted, Plaintiff's ability to perform skilled work is not consistent with mental retardation.   See Cheatum, 388 Fed. Appx. at 577 (ability to maintain employment in semi-skilled and unskilled positions for many years considered as a factor inconsistent with mental retardation); Hines v. Astrue, 317 Fed. Appx. 576, 579 (8th Cir. 2009)

---

[14]  "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."   Social Security Ruling 00-4p (Dec. 4, 2000).

(ability to perform semi-skilled job considered as a factor inconsistent with mental retardation).

The ALJ's determination that Plaintiff's condition did not meet Listing 12.05C, because he lacked the requisite deficits in adaptive functioning is supported by the evidence discussed above.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC. Plaintiff also contends that the ALJ failed to properly evaluate medical opinion evidence when determining his RFC.

The ALJ made the following determination with regard to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he must avoid walking on uneven terrain or climbing ladders, ropes or scaffolds, but he can occasionally stoop, kneel, crouch, and crawl. Additionally, the claimant is limited to performing simple, repetitive tasks with no close public interaction.

(Tr. 18)

RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff argues that the ALJ erred in discrediting the opinion of treating sources and assigning great weight to the opinion of the non-examining medical expert.

In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence" in the record. 20 C.F.R. § 404.1527(b). See Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 404.1527(e)(2)(ii).

The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Pearsall, 274 F.3d at 1219. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Dr. Tomescu, one of Plaintiff's treating physicians at Steele Family Clinic, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on April 28, 2008. (Tr. 425-27)  Dr. Tomescu expressed the opinion that Plaintiff could only occasionally lift less than ten pounds and could not frequently lift any amount of weight; stand or walk less than 2 hours in an 8 hour workday; sit less than 6 hours of an 8 hour workday; requires unscheduled breaks during an 8 hour working day; needs a job that permits shifting positions at will from sitting, standing, or walking; could never climb, stoop, kneel, crouch, or crawl; could occasionally balance; was limited in his ability to reach, handle, finger, feel, see, hear, and speak; and should avoid heights, moving machinery, and temperature extremes.  Id.  Dr. Tomescu indicated that her opinions were based on physical examinations and an MRI of the cervical spine.  (Tr. 425)  Dr. Tomescu stated that Plaintiff has severe degenerative disc disease of the cervical spine, with multiple bulging discs, and "with severe motor and sensory impairment."  (Tr. 427)  Dr. Tomescu also completed a "Medical Opinion to Medical Listing 1.04," in which she expressed the opinion that Plaintiff's condition meets Listing 1.04A and 1.04C due to spinal stenosis at the cervical level.  (Tr. 423)

The ALJ discussed Dr. Tomescu's assessments and indicated he was assigning them "little weight," because they were not consistent with the objective evidence and they conflict with Dr. Tomescu's own treatment notes.  (Tr. 20)

The undersigned finds the ALJ provided sufficient reasons for assigning little weight to Dr. Tomescu's opinion.  First, the ALJ noted inconsistencies between Dr. Tomescu's opinion and her subsequent treatment notes.  For example, in March 2011, Plaintiff reported that he had not been taking pain medication for a month.  (Tr. 412)  Dr. Tomescu noted no weakness or loss of sensation.  (Tr. 413)  The ALJ acknowledged that Plaintiff had a positive straight leg raise test,

but noted that there is no indication whether the test was conducted in both the sitting and supine positions. On May 16, 2011, Dr. Tomescu indicated that Plaintiff had full range of motion of the neck, normal gait without use of assistive devices, intact range of motion of the spine, normal flexibility of joints, no tenderness to palpation, normal extremities, and normal sensation. These treatment notes do not support Dr. Tomescu's opinion that Plaintiff had a disabling back condition.

Second, the ALJ properly noted that the records of Drs. Fonn, Burchett, and Janese did not support Dr. Tomescu's opinion. Plaintiff saw Dr. Fonn, a neurosurgeon, in December 2009 with complaints of neck and back pain. (Tr. 368) Upon examination, Plaintiff had full motor strength throughout, normal gait and station, normal tone, no atrophy, and intact sensation. (Tr. 369) Dr. Fonn recommended a course of physical therapy. Id. Plaintiff saw Dr. Fonn for follow-up on February 3, 2010, at which time Dr. Fonn indicated that Plaintiff's MRI revealed only "mild pathology" at the C6-7 level that did not require surgical intervention. (Tr. 388) Dr. Fonn recommended conservative treatment, including injections. Id. On March 3, 2010, Plaintiff reported that the epidural injection he had undergone provided "significant relief" of his symptomatology. Dr. Fonn recommended epidural injections every six months, unless Plaintiff's symptomatology became "significantly worse." There is no evidence of any further treatment with Dr. Fonn. Id.

Plaintiff saw Dr. Burchett for a consultative internal medical examination on November 1, 2011. (Tr. 431-36) Upon examination, Dr. Burchett noted no tenderness or paravertebral muscle spasm of the cervical or dorsolumbar spine; full range of motion of the cervical spine; no evidence of atrophy; well-preserved sensory modalities; and no evidence of compressive neuropathy in the upper extremities. Plaintiff's straight leg raise test was positive bilaterally in the supine position. Plaintiff was able to stand on one leg at a time without difficulty, walk on his

heels and toes, and walk 50 feet without assistance. Dr. Burchett noted that, while Plaintiff reported using a cane constantly, "this may not be medically necessary."

Dr. Janese testified as a medical expert at the supplemental hearing. (Tr. 64-71) Dr. Janese indicated that he had reviewed the medical records, and provided a detailed summary of the medical evidence. Dr. Janese expressed the opinion that Plaintiff retained the functional capacity to perform work at the medium exertional level.

The other medical evidence of record discussed above does not support Dr. Tomescu's finding that Plaintiff has disabling limitations as a result of his back impairments. Dr. Tomescu indicated that her opinion was based on physical examinations and an MRI of the cervical spine. (Tr. 425) The medical evidence, however, does not reveal significant findings on examination. Dr. Tomescu's own examination in May 2011 revealed no abnormalities. Dr. Fonn's December 2008 examination revealed Plaintiff had full motor strength throughout, normal gait and station, normal tone, no atrophy, and intact sensation. Dr. Burchett's November 2011 examination revealed no tenderness or paravertebral muscle spasm of the cervical or dorsolumbar spine; full range of motion of the cervical spine; no evidence of atrophy; well-preserved sensory modalities; and no evidence of compressive neuropathy in the upper extremities. Thus, the medical evidence of record does not support Dr. Tomescu's finding of "severe motor and sensory impairment."

The undersigned finds that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. The ALJ indicated that he was assigning "great weight" to Dr. Janese's opinion that Plaintiff was capable of performing medium work, as it was consistent with the objective medical evidence discussed above. (Tr. 20) The ALJ found, however, that Plaintiff was more restricted, and limited Plaintiff to a range of light work. The ALJ indicated that his determination was based on Dr. Janese's testimony, Plaintiff's course of treatment, his

MRIs, and the opinion of the consultative examiner.   (Tr. 21)

Plaintiff contends that the ALJ erred in forming his own opinion based on the medical evidence instead of relying on the opinion of a physician.   It is the ALJ's responsibility to determine the claimant's RFC based on all the medical evidence.   See Lauer, 245 F.3d at 704. The ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."   Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (quoting Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)).

In this case, the ALJ properly determined Plaintiff's RFC based on all the evidence of record, including the medical evidence, observations of physicians, and Plaintiff's testimony. The ALJ was not required to adopt Dr. Janese's opinion or the opinion of any other physician. The ALJ properly performed his function of weighing conflicting evidence and resolving disagreements among Plaintiff's treating and consulting physicians concerning Plaintiff's RFC. The ALJ considered the medical evidence, including the MRIs, and consultative examination, and found that Plaintiff was more restricted than found by Dr. Janese.   Substantial evidence supports this determination.

The ALJ concluded, based on this RFC, that Plaintiff was capable of performing past relevant work as a painter or assembler.   (Tr. 21)   Although vocational expert testimony was not required, the ALJ obtained assistance from a vocational expert in making the determination that Plaintiff was capable of performing his past relevant work.   See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) ("[u]nder the five-step analysis of social security cases, when a claimant can perform his past relevant work, he is not disabled.   Once this decision is made ... the services of a vocational expert are not necessary.") (quoting Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996)).

**Conclusion**

Substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.   Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of September, 2014.